**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: | Chapter 11 |
| OAKFABCO, INC., | Case No. 15-27062 |
| Debtor. | |

**DECLARATION OF FREDERICK W. STEIN IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST DAY PLEADINGS OF OAKFABCO, INC.**

I, Frederick W. Stein, hereby declare under penalty of perjury:

1. I am the President and sole director of Oakfabco, Inc. f/k/a Kewanee Boiler Corporation (the "Debtor"), assuming the role of President after the death of my father, William C. Stein, who was the Debtor's sole shareholder. I have never been an employee of the Debtor. I am a member in good standing of the bar of the State of Illinois. I currently serve as the general counsel of a Chicago area company engaged in retail services.

2. Concurrently with the filing of this declaration (this "Declaration"), on the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Illinois (the "Court") commencing the above-captioned chapter 11 case (this "Chapter 11 Case"). The Debtor has requested certain relief in "first day" applications and motions filed with the Court (collectively, the "First Day Pleadings") to promote a seamless transition into this Chapter 11 Case and enable the Debtor to efficiently administer its estate and its affairs.

3.      I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of this Chapter 11 Case and in support of the Debtor's chapter 11 petition for relief and the First Day Pleadings.

4.      Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my knowledge and review of relevant documents including the Debtor's books and records, or my opinion based on my experience, knowledge, and information concerning the Debtor's history and financial condition. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

5.      Part I of this Declaration provides an overview of the Debtor's corporate history. Part II of this Declaration summarizes the circumstances leading to the commencement of this Chapter 11 Case. Part III discusses the objectives of this Chapter 11 Case, and Part IV sets forth the relevant facts in support of the First Day Pleadings.

**I.      THE DEBTOR AND ITS HISTORY**

   **A.      Purchase of Kewanee Boiler from American Standard**

6.      For many years prior to 1970, American Standard, Inc. ("American Standard") owned and operated a commercial boiler manufacturing division known as "Kewanee Boiler." The boilers manufactured and sold by Kewanee Boiler were insulated with asbestos.

7.      Pursuant to an asset purchase agreement (the "1970 Agreement"), dated January 29, 1970, American Standard sold all of the assets and certain liabilities of Kewanee Boiler to Kewanee Boiler Corporation ("Kewanee"), a newly-formed Illinois corporation.

8.      Under the 1970 Agreement, Kewanee assumed all of the "Kewanee Liabilities" at closing. "Kewanee Liabilities" was defined to mean "the debts, liabilities,

obligations and commitments (fixed or contingent) connected with or attributable to Kewanee existing and outstanding at the Closing Date." Additionally, Kewanee provided American Standard with an Undertaking on the closing date, pursuant to which Kewanee assumed and agreed to pay and defend and hold American Standard harmless against all Kewanee Liabilities, including claims and complaints arising out of or in connection with any products manufactured, sold, leased, or installed by Kewanee Boiler on or prior to the closing date.

9. In 1975, William C. Stein and others purchased the stock of Kewanee through a holding company.

### B.     The 1986 Bankruptcy Proceedings

10. On October 28, 1986, Kewanee filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court for the purpose of dealing with ongoing losses associated with the boiler business. During the bankruptcy case, Kewanee sold its boiler manufacturing assets to Coppus Engineering Corporation and was renamed Oakfabco, Inc. In March 1988, this Court confirmed Oakfabco's second amended chapter 11 plan of reorganization (the "1988 Plan").

11. Class 6 claims are defined in the 1988 Plan as "[a]ll unsecured claims, other than those in Classes 1, 2, 3, and 4, including those claims arising from the rejection of executory contracts and unexpired leases." 1988 Plan, Art. I. Among others, Class 6 includes existing asbestos-related claims against the Debtor. Class 6 claims were paid under the 1988 Plan *pro rata* out of a sinking fund made up of annual payments by the Debtor for a period of six years amounting each year to 60% of its net cash flow. See 1988 Plan, Art. II, § 2. The Debtor did not take any steps in the 1988 Plan to limit its liability to claimants who might assert a claim for asbestos-related diseases after confirmation of the 1988 Plan.

12. In 1996, this Court determined that future victims of torts from defective boilers cannot be forced into participating in the limited distribution that unsecured creditors are entitled to receive under the 1988 Plan. See Kewanee Boiler Corp. v. Smith (In re Kewanee Boiler Corp.), 198 B.R. 519, 539 (Bankr. N.D. Ill. 1996). Rather, this Court determined that such tort claimants may seek to collect against the reorganized Debtor. See id. at 540-541.

## II. EVENTS LEADING TO COMMENCEMENT OF THIS CHAPTER 11 CASE

### A. Tort Claims

13. As discussed in Part I, the Debtor did not take steps in connection with its 1986 bankruptcy case to limit its liability to future tort claimants, as the main reason for the 1986 filing was to deal with ongoing losses associated with the boiler business. Because no such provision was made in the 1988 Plan, and as a consequence of this Court's decision in Smith, claimants have continued to file claims against the Debtor since confirmation of the 1988 Plan. Such claimants seek money damages for personal injury and wrongful death alleged as a result of exposure to asbestos-containing products allegedly manufactured or sold by the Debtor or a predecessor in interest (the "Asbestos Claims"). As of the commencement of this Chapter 11 Case, the Debtor estimates that there are approximately 3,400 active Asbestos Claims and over 30,000 inactive Asbestos Claims outstanding against the Debtor.

### B. Settling Insurers

14. The Debtor is the policyholder under various insurance policies (the "Policies") that provide coverage for Asbestos Claims. Among the issuers of such insurance are: (i) First State Insurance Company, New England Reinsurance Company, and Twin City Fire Insurance Company (collectively, "Hartford"); (ii) Affiliated FM Insurance Company ("Affiliated FM"); and (iii) American Casualty Company, Continental Casualty Company and

Columbia Casualty Company (together, "CNA"). Hartford, Affiliated FM, and CNA are referred to hereinafter collectively as the "Settling Insurers." For several years, resolution of the Asbestos Claims has been handled exclusively by the Settling Insurers, pursuant to a 2010 Cost-Sharing Agreement.

### C.    Events Leadings to the Filing

15.    After years of covering the Debtor's defense and indemnity costs relating to the Asbestos Claims, it is anticipated that the Debtor's coverage for defense costs, if not exhausted already, will be soon exhausted. As such, only those plaintiffs who rush to judgment likely will be compensated. As a result, in consultation with its counsel, the Debtor determined that it is in the best interests of the Debtor and its asbestos-related creditors for the Debtor to attempt to monetize its remaining insurance and commence this Chapter 11 Case to effect a fair and efficient distribution to those creditors.

16.    To that end, the Debtor conducted negotiations with the Settling Insurers prior to filing this Chapter 11 Case. Those negotiations resulted in settlement agreements that monetize the policies issued by the Settling Insurers in the amount of $17,333,079, with $4,550,000 from Affiliated FM, $3,000,000 from Hartford, and $9,783,079 from CNA. The Debtor has documented and executed settlements with Affiliated FM and Hartford. The Debtor reached an agreement with CNA. Documentation of that settlement is in process as of the filing of this Chapter 11 Case.

17.    A portion of the proceeds of the settlement with the Settling Insurers will be used to fund this Chapter 11 Case. Prior to the Petition Date, the Settling Insurer's each provided, for the benefit of the Debtor, an advance payment of $50,000, aggregating $150,000, to Reed Smith LLP (proposed counsel for the Debtor ("Reed Smith")), for professional servicers

- 5 -

to be rendered and expenses to be incurred by Reed Smith for services to be provided to the Debtor in connection the preparation for the commencement of these proceedings. Additionally, prior to the Chapter 11 filing, Hartford and Affiliated FM made subsequent payments of $450,000 and $675,000, respectively, in connection with their obligations under their settlement agreements. All such sums provided by the Settling Insurers (which aggregate $1,275,000) were deposited in Reed Smith's client trust account. Reed Smith setoff the amount of its fees and expenses incurred to the date of this Chapter 11 filing against the balance in its trust account and has agreed to transfer the remaining balance to a debtor-in-possession account that will be used to fund the costs of administering this Chapter 11 Case. It is intended that funds remaining in the debtor-in-possession account after payment of administrative expenses of the Chapter 11 Case will be transferred, together with other insurance settlement payments, to the liquidating trust to pay Asbestos Claims.

      **D.**      **Debtor's Current Status**

      18.      In cooperation with the Settling Insurers, the Debtor's sole business is defending and, where appropriate, settling the Asbestos Claims through the use of insurance proceeds. The Debtor has not manufactured boilers since 1988 when it sold its Kewanee boiler business in a section 363 sale to Coppus Engineering Corporation as described in paragraph 10. In early 2009, the Debtor sold all of its remaining assets. The Debtor has no employees, and, as noted above, I am the Debtor's sole officer and director. The Debtor's sole remaining asset is its insurance, and it has no known liabilities other than the Asbestos Claims.

**III.**      **PURPOSE OF THIS CHAPTER 11 CASE**

      19.      The Debtor filed this Chapter 11 Case for the purpose of resolving all existing Asbestos Claims. It is not the Debtor's intention to treat so-called future claims or

- 6 -

demands. To resolve current claims, the Debtor intends to seek approval of the insurance settlement agreements and confirmation of a chapter 11 plan of liquidation as soon as practicable. The plan will provide for the establishment of a liquidating trust into which the remaining insurance proceeds from the Settling Insurers and insurance rights against other insurers that may have obligations to Oakfabco will be transferred. The liquidating trust will assume liability for all current Asbestos Claims and will use its assets to resolve the Asbestos Claims. By monetizing the Settling Insurers' Policies and establishing procedures to govern trust distributions, the liquidating trust will be able to value and pay current Asbestos Claims in a fair and efficient manner. The approval of the insurance settlement agreements and confirmation of a plan of liquidation will ensure a fair and equitable distribution among current asbestos claimants.

20. After transferring its current Asbestos Claims and insurance assets to the liquidating trust, the Debtor will seek the Court's approval to cancel its corporate existence.

## IV.  SUMMARY OF FIRST DAY MOTIONS

21. Concurrently with its chapter 11 petition, the Debtor filed the following First Day Pleadings:

  a. Debtor's Motion for Entry of an Order (I) Authorizing the Listing of Addresses of Counsel for Personal Injury Claimants in Creditor Matrix in Lieu of Claimants' Addresses and (II) Approving Notice Procedures for Such Claimants;

  b. Debtor's Motion for Entry of an Order Establishing Master Service List and Related Case Management Procedures; and

  c. Debtor's Motion for Entry of an Order Extending Deadline to File Schedules of Assets and Liabilities and Statement of Financial Affairs.

22. I am familiar with the contents of each First Day Pleading, and the facts set forth therein are true and correct to the best of my knowledge. The relief sought in the First

Day Pleadings will allow the Debtor to, among other things, establish certain administrative procedures to promote a seamless transition into this Chapter 11 Case and enable the Debtor to efficiently administer its estate and its affairs.  As asset forth more fully below, I believe the entry of orders granting the relief requested in the First Day Pleadings will provide critical assistance in the Debtor's reorganization efforts.

### A.      Serving Counsel in Lieu of Asbestos Claimants

23.     The Debtor's defense coordinating counsel has tracked Asbestos Claims against the Debtor by maintaining a database that identifies the names, but not the addresses, of the holders of Asbestos Claims (the "<u>Claimants</u>").  Defense coordinating counsel's database does include the addresses for the Claimants' respective counsel of record, and all communications regarding the Asbestos Claims and the various pending lawsuits are conducted through counsel.

24.     Throughout the course of this Chapter 11 Case, various notices, mailings, and other communications must be sent to the Claimants.  To ensure that the Claimants receive proper and timely notice of filings and critical events in this Chapter 11 Case, the Debtor seeks to establish the following procedures (the "<u>Notice Procedures</u>") to give notice to Claimants in this Chapter 11 Case.  With the assistance of an agent approved by the Court, the Debtor proposes to serve all notices, mailings, and other communications that are required to be served on the Claimants to the Claimants' respective counsel of record in the manner required pursuant to applicable noticing procedures in effect in this Chapter 11 Case.

25.     By establishing the Notice Procedures in this Chapter 11 Case, the Claimants will receive superior notice than they would if the Debtor attempts to deliver notices directly to the Claimants.  The Claimants are lay persons, most of whom have not been involved in a commercial bankruptcy case or seen the types of notices and pleadings that will be served in

this Chapter 11 Case and likely will be unfamiliar with the actions that may be required to respond to such notices. Additionally, the Notice Procedures will ease the Debtor's administrative burden of sending notices to thousands of Claimants, resulting in more cost-effective notice procedures that benefit the Debtor's estate and creditors.

B. **Establishing Master Service List and Related Case Management Procedures**

26. Based upon information currently available to the Debtor, there are approximately thirty-four thousand (34,000) creditors and parties in interest that may be entitled to receive notice in this case. If the Debtor is required to serve all creditors with all pleadings, its resources would be strained unnecessarily. It is cost-prohibitive and not in the best interests of the estate to require service of all pleadings upon all parties. To alleviate this burden, the Debtor requests that a master service list be established for this Chapter 11 Case. The Debtor believes that establishing a master service list and related case management procedures will reduce costs to, and preserve assets of, the estate by ensuring that only those with a vested interest in a particular motion or pleading receive it.

C. **Extension of Time to File Schedules and Statement of Financial Affairs**

27. Cause exists to extend the date on or before which the Debtor must file its schedules and statement of financial affairs by thirty (30) days. The Debtor has no employees, and I am the only officer and director. I have been busily engaged preparing for this Chapter 11 Case, and additional time is needed to compile the requisite information to complete the schedules and statement of financial affairs. Moreover, an extension will not harm creditors or other parties in interest because, even under the extended deadline, the Debtor will file the schedules and the statement of financial affairs far in advance of any deadlines likely to be set in this Chapter 11 Case.

- 10 -

*[The remainder of this page was intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: August 7, 2015

_____
Frederick W. Stein
Oakfabco, Inc.

US_ACTIVE-122685907