United States Bankruptcy Court

Northern District of Illinois

Eastern Division

|  |  |
|---|---|
| In re:<br><br>Oakfabco, Inc.,<br><br>Debtor. | Bankruptcy No. 15 B 27062<br><br>Chapter 11 |

## OPINION ON DEBTOR'S MOTION TO APPROVE ASSUMPTION OF A SETTLEMENT AGREEMENT AND RELEASE BETWEEN OAKFABCO, INC. AND NEW ENGLAND REINSURANCE CO. [DKT. NO. 67]

Debtor moved for approval of a settlement with New England Reinsurance Company ("New England") (Dkt. No. 67) which was objected to by the Asbestos Claimants' Committee, (Dkt. No. 338.) New England and the Debtor filed responses in favor of the settlement. (Dkt. Nos. 274 & 354.) Debtor's motion was amended to offer $4.5 million. For reasons stated below, Debtor's motion will be granted by separate Order entered this date.

## JURISDICTION

Jurisdiction lies under 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and the standing referral order under District Court for the Northern District of Illinois Internal Operating Procedure 15(a). The requested relief is based on Bankruptcy Rule 9019(a) and 11 U.S.C. §§ 363 and 365.

## BACKGROUND

This Chapter 11 case was filed by Debtor Oakfabco, Inc., a company that made boilers that were sold nationwide. Though operations ceased, the consequences of asbestos use in its manufacturing posed issues, as it became apparent that insurance to protect against resulting asbestos claims was inadequate to cover those claims.

On September 11, 2015, the Debtor filed a Motion for the Court to approve a prepetition settlement agreement negotiated between the Debtor and New England to settle Debtor's claims against available insurance (the "Settlement Agreement").

(Debtor's Motion to Assume, Dkt. No. 67, [Dr's Mtn.].)  The Settlement Agreement
provided that the Debtor will sell New England's insurance policy (the "1983 Policy")
back to New England pursuant to section 363 (f) & (m) originally for $3 million.  The
settlement amount increased to $3.5 million, (New England's Reply, Dkt. No. 354 [NE
Reply], p. 2), and has reached a total of $4.5 million, (New England's Memorandum in
Support of Amendments to Proposed Settlement, Dkt. No. 512, [NE Memo], p. 2.).  In
return, New England and the Debtor agreed to release causes of action between one
another.  Also, the Debtor agreed that its Chapter 11 plan will include a third party
injunction that bars assertion against New England for any asbestos claims or released
claim, including direct actions claims.  The Debtor must receive court approval of the
assumption of the Settlement Agreement.

The Asbestos Claimants' Committee ("ACC") appointed by the United States
Trustee objected to the Settlement Agreement.  (ACC's Amended Objection, Dkt. No.
338, [ACC Am. Obj.].)  The ACC's objection to approval of the Settlement Agreement is
based on two arguments.  First, the ACC believes that the Debtor does not have a valid
business justification for entering into the Settlement Agreement.  At the time of
negotiations, the Debtor lacked information and was in a financially compromised
position.  As a result, the negotiations were not fair and the Debtor should withdraw
from the Settlement Agreement.  The ACC also argues that the Debtor lacks a valid
business justification, because the Settlement Agreement amount is too low.
Specifically, the ACC puts forth that two documents in relation to the 1983 Policy
warrant upwards of $20 million in additional coverage.  The documents are the binder
(the "Binder") and the renewal certificate (the "Renewal Certificate").  Second, the ACC
argues that the releases, injunctions, and indemnifications in the Settlement Agreement
for New England and the Debtor are too broad to grant approval.

New England moved for partial summary judgment to establish that the Binder
was terminated and superseded by the Renewal Certificate, and the Binder does not

provide insurance coverage to the Debtor. (Dkt. No. 339.) The partial summary judgment motion was denied by Memorandum Opinion on June 29, 2017. (Dkt. No. 459 (later amended by Dkt. No. 490).)

The motion as it then stood was taken under advisement. (Dkt. No. 509.)

On July 24, 2017, New England submitted a Memorandum in Support of Amendments to Proposed Settlement stating that the settlement offer has been increased to a total of $4.5 million. (Dkt. No. 512.)

## UNDISPUTED FACTS

While the Motion for Partial Summary Judgment was denied, work on it produced Findings of Undisputed Facts:

1. On August 7, 2015, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, in the United States Bankruptcy Court for the Northern District of Illinois, which was assigned bankruptcy case No. 15-27062. (Dkt. No. 1.)

2. The Debtor, Oakfabco, Inc. is an Illinois corporation that was formerly known as Kewanee Boiler Corporation. (Dr's Mtn., at ¶ 7.)

3. The Debtor continues in the management of its property as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. (*Id.*, at ¶ 2.)

4. On August 27, 2015, the United States Trustee appointed the ACC pursuant to § 1102(a)(l) of the Bankruptcy Code. (Dkt. No. 51.)

5. New England issued the 1983 Policy to Kewanee Boiler Corporation. (Dr's Mtn., at ¶ 12.)

6. The 1983 Policy's declarations page identifies the Policy Period as extending "From: March 1, 1983 To: March 1, 1984." (*Id.*; ACC Am Obj., Ex. A., at p. 1.)

7. Montgomery & Collins, Inc. of Illinois, as general agent for New England and as its surplus lines broker, issued the Binder dated March 6, 1984. (ACC Am. Obj., Ex. B.) New England does not allege that it objected to issuance of the Binder.

8. The Binder identifies the Insurer as New England Reinsurance Corp. and references the full name of the 1983 Policy, "Policy/Certificate No(s) 688013." (*Id.*)

9. The Binder identifies the Binder Period as "From: March 1, 1984 To: May 1, 1985" and states that "This binder will be terminated and superseded upon delivery of formal policy(ies)/certificate(s) issued to replace it." (*Id.*)

10. The Binder identifies the "Policy Period" as "From: March 1, 1984 To: May 1, 1985." (*Id.*)

11. The Binder states: "Forms applicable are subject in all respects to the terms, conditions and limitations of the policy(ies)/certificate(s) in current use by the insurer(s) unless otherwise specified." (*Id.*)

12. Under "Conditions" the Binder provides for payment of a premium to Montgomery & Collins, Inc. of Illinois. Debtor paid the premium set forth in the Binder. (*Id.*)

13. Under "Other Conditions" the Binder states "Renewal continuation of present policy." (*Id.*)

14. New England issued and delivered a document titled "RENEWAL CERTIFICATE" to the Policy, previously defined as the Renewal Certificate. (*Id.*, at Ex. C.)

15. The Renewal Certificate states as follows:

> In consideration of an Additional Premium of $17,650., it is agreed that this policy is extended to expire March 1, 1985.
>
> It is further agreed that the Company's liability, as stated as the annual aggregate limit in Item 3-II of the Declarations, shall apply as an Additional Limit during the Policy Period 3/1/84 to 3/1/85 for those coverages that are subject to an annual aggregate Limit of Liability.

All other terms and conditions remain unchanged.
Policy No: 688013
Issued to: Kewanee Boiler Corporation

(*Id*.)

16. As of August 7, 2015, the date of the Debtor's bankruptcy filing, there were

approximately 3,400 active asbestos claims and over 30,000 inactive asbestos claims

against the Debtor. (*Id*., at p. 3.)

Additional pertinent facts are set forth in the Discussion that follows:

## DISCUSSION

It is to be determined whether the Settlement Agreement should be rejected or

approved. Bankruptcy Rule 9019 provides, in relevant part, "On motion by the [debtor

in possession] and after notice and a hearing, the court may approve a compromise or

settlement." Fed. R. Bankr. P. 9019(a). The ACC objects to approval of the Settlement

Agreement for two reasons: (1) the Debtor's business justifications for approval of the

Settlement Agreement are not valid and (2) the Settlement Agreement improperly

includes third-party releases, injunctions, and indemnification obligations that are

neither narrowly tailored nor essential to a reorganization. (ACC Am. Obj., pp. 6-17.)

### A.    Settlement Agreement Standards

A bankruptcy court should approve a settlement agreement if it is in the best

interest of the bankruptcy estate. *In re Holly Marine Towing, Inc. (Holly Marine Towing)*,

669 F.3d 796, 801 (7th Cir. 2012).

The court should consider "the litigation's probability of success, complexity,

expense, inconvenience, and delay, 'including the possibility that disapproving the

settlement will cause wasting of assets.'" *In re Doctors Hosp. of Hyde Park, Inc. (Hyde Park*

*Doctors Hosp.)*, 474 F.3d 421, 426 (7th Cir. 2007) (quoting *In re Am. Reserve*, 841 F.2d 159,

161 (7th Cir. 1987)). When a settlement amount falls within "the reasonable range of

possible litigation outcomes," it passes "the best interests" test. *Hyde Park Doctors Hosp.*, 474 F.3d at 426.

"The value of the settlement must be reasonably equivalent to the value of the claims surrendered." *In re Energy Co-op. Inc.*, 886 F.2d 921, 927-29 (7th Cir. 1989). "[L]itigation outcomes cannot be predicted with mathematical precision" and as long as the settlement does not fall below the low end of possible litigation outcomes, it will pass "the reasonable equivalence standard." *Hyde Park Doctors Hosp.*, 474 F.3d at 426. As a policy matter, settlements are generally favored due to their expediency, finality, and cost-effective results. *Fogel v. Zell*, 221 F.3d 955, 960 (7th Cir. 2000).

When a settlement involves a sale of bankruptcy assets, the debtor in possession must satisfy the business judgment standard by articulating a sound business purpose for doing so. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991). Courts have recognized that insurance policies are property of a debtor's estate, which may be sold with court approval under section 363 of the Bankruptcy Code. *See, e.g., MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 92-93 (2d Cir. 1988).

Proponents of a settlement bear the burden to establish that it is in the best interest of the estate, and the objectors must produce evidence to support its objection. *LaSalle Bank Nat. Ass'n v. Doctors Hosp. of Hyde Park, Inc.*, No. 04 C 4319, 2005 WL 1766370, at *9 (N.D. Ill. July 21, 2005); *In re Del Grosso*, 106 B.R. 165, 168 (Bankr. N.D. Ill. 1989). Evidence was presented here by reference to exhibits and documents, which have not been challenged as to their authenticity or completeness of the references.

On review, a bankruptcy court's approval of a settlement will not be disturbed unless the approval constitutes an abuse of discretion. *Holly Marine Towing*, 669 F.3d at 799. "[The] standard is highly deferential since the bankruptcy court is in the best position to consider the reasonableness of a particular settlement." *Id.*

### i.   *The Settlement Agreement is in the Best Interest of the Estate*

Prior to the Debtor's bankruptcy, New England reported to the Debtor that the

1983 Policy of $10 million was exhausted.  (Dr's Mtn., at ¶ 12.)  The Debtor believed that

there was an additional $10 million available in the 1983 Policy due to the Renewal

Certificate.  (*Id.*, at ¶ 13.)  After continued negotiations and analysis of Illinois

precedent, however, the Debtor determined that the prospect of a court finding that the

1983 Policy had additional money to fund asbestos claims was slim.  (*Id.*, at ¶ 14.)  New

England explained that although it believed that no additional funds were available in

the insurance policy, it decided to engage in settlement discussions because the

bankruptcy settlement offered finality.  (NE Reply, p. 2.)  The Debtor accepted the

settlement offer (recently increased to $4.5 million) in exchange for releases and

injunctions in favor of New England.  (*Id.*)

> The purpose of entering into the Settlement Agreement for the Debtor was to:
>
> resolve and thereby eliminate the dispute between the Debtor and New
> England over the accessibility of additional coverage for Asbestos Claims
> under the 1983 Policy. It makes the settlement more immediately
> accessible than had the Debtor litigated with New England or awaited the
> normal delays attendant to the tort system, and facilitates the fair and
> efficient distribution of proceeds to the Debtor's asbestos creditors.

(Dr's Mtn., at ¶ 25.)  In regards to the actual amount, the Debtor believes:

> [t]he . . . payment from New England . . . will enable the Debtor to arrange
> for an orderly distribution of those monies . . . to the [Asbestos Claimants],
> while avoiding the costs of litigating or otherwise resolving the parties'
> dispute over the availability of any coverage for Asbestos Claims under
> the [Policy].

(*Id.*, at ¶ 15.)  The Debtor also stated it decided to enter into the Settlement Agreement,

because there was no "realistic" possibility of receiving additional coverage from New

England.  (*Id.*, at ¶ 24.)

The first step to determine whether to approve the Settlement Agreement is to weigh the costs and benefits of settling versus litigation—factoring delay, complexity, expense, and the claim's likelihood of success. *Hyde Park Doctors Hosp.*, 474 F.3d at 426. The Debtor could have withdrawn from negotiations and litigated the dispute to seek additional coverage under the 1983 Policy against New England. The Debtor would thereby have certainly incurred litigation expenses and delayed administration of the bankruptcy. These factors would favor the decision to settle. To further support approval of the settlement, the potential litigation dispute between New England and the Debtor is not a simple case, as it centers on insurance policy interpretation from documents that are over thirty years old.

The claim's likelihood of success is the remaining factor at issue. The ACC says that the Settlement Agreement should be rejected, because ACC contends that Debtor has a strong likelihood of success against New England.

To the contrary, Debtor claimed in its Motion that it accepted the original Settlement Agreement, because there stood a realistic chance that litigating the matter could result in a court ruling that the 1983 Policy was completely exhausted—meaning that New England would owe nothing to the Debtor. (Dr's Mtn., at ¶ 24.)

The Debtor's conclusion that litigation posed a realistic chance of failure was, and remain, sound. Both parties cite to Illinois caselaw and presumably agree that Illinois law controls.

"A contract of insurance is established if one of the parties to such a contract proposes to be insured and the other party agrees to insure, and the subject, the amount, and the rate of insurance are ascertained or understood and the premium paid if demanded." *Zannini v. Reliance Ins Co. of Illinois*, 590 N.E.2d 457, 464 (Ill. 1992) (internal quotation marks and citations omitted). In Illinois, a binder is intended to provide temporary insurance until the insurer decides to reject or extend coverage. *Ins. Co. of Ill. v. Brown*, 734 N.E.2d 964, 969 (Ill. App., 1st Dist. 2000). Illinois courts have not

spoken as to whether a binder terminates upon extension or refusal. That uncertainty would lend itself to settling. To further the point, two state courts have concluded that a binder terminates upon extension or refusal. *See, e.g., Peele v. Atl. Exp. Transp. Grp., Inc.*, 840 A.2d 1008, 1011 (Sup. Ct. Pa. 2003); *Springer v. Allstate Life Ins. Co. of N.Y.*, 731 N.E.2d 1106, 1108 (N.Y. App. 2000). Indeed, the Binder involved here itself stated that it "will be terminated and superseded upon delivery of formal policy(ies)/certificate(s) issued to replace it." (ACC Am. Obj. Ex. B, p. 1.) Although it is a question as to whether the Renewal Certificate supersedes and terminates the Binder, it was sound for the Debtor to believe that a court could find that the Renewal Certificate did in fact do so.

In reference to the Renewal Certificate, it was also reasonable for the Debtor to believe that the Renewal Certificate did not add more coverage to cover asbestos claims. Illinois precedent would suggest that use of asbestos in manufacturing and production of products amounts to a single occurrence for insurance coverage. *See, e.g., U.S. Gypsum v. Admiral Ins. Co.*, 643 N.E.2d 1226, 1258-59 (App. Ill., 1st Dist. 1994) (considering asbestos use a single occurrence when calculating deductibles); *Cont'l Cas. Co. v. Borgwarner Inc.*, No. 04 CH 01708, Order (Cook City. Cir. Ct., Flynn, J., Feb. 14, 2012); *John Crane Inc. v. Admiral Ins. Co.*, No. 04 CH 8266, 2006 WL 1010495, *26 (Ill. Cir. Ct., April 12, 2006); *see also Nicor, Inc. v. Associated Elec. & Gas Ins. Services Ltd.*, 860 N.E.2d 280, 294-95 (Ill. 2006). The "per occurrence" limit for the 1983 Policy is $10 million and has been exhausted according to New England. (Dr's Mtn., at ¶ 12.) Because Illinois courts would appear to rule that the Debtor's asbestos-use constitutes a single occurrence, the Renewal Certificate would need to increase the "per occurrence" limit for there to be any remaining coverage to handle asbestos claims. The Renewal Certificate does not state that anywhere. (ACC Am. Obj, Ex. C.) It seems realistic that a court could find the Renewal Certificate simply extended the 1983 Policy for another year without adding more coverage to its "per occurrence" limit. In all, it was of sound

discretion for the Debtor to believe that litigating the dispute had a low probability of success.

Although litigating might result in recovery of additional coverage, the Debtor believed that it had a low likelihood of success. In lieu of litigating and potentially losing out on any payment from New England, the Debtor settled. By accepting the Settlement Agreement, and selling the 1983 Policy, the Debtor will provide the bankruptcy estate with $4.5 million. The $4.5 million offer would go to the bankruptcy estate and end the dispute with New England. It has a sound business justification.

The potential litigation outcomes for the 1983 policy at the time of negotiations realistically ranged from no coverage to an additional $10 million of coverage. The Settlement Agreement of $4.5 million falls within this range. Accordingly, the Settlement Agreement amount is a reasonable equivalent to the claim surrendered. *Hyde Park Doctors Hosp.*, 474 F.3d at 426.

In the best interest of the estate, and in turn in the best interest of asbestos claimants, the Debtor chose the settlement to guarantee funds, as opposed to gambling it all in a battle for more coverage. The Debtor exercised a sound business decision by accepting the Settlement Agreement to sell the 1983 Policy, and the Settlement Agreement as amended will be approved.

### ii.    *The ACC's Objections to Debtor's Business Justifications*

The ACC believes that the Debtor's justifications are not valid and should not be subject to deference. These arguments, however, are not enough to overcome the Debtor's decision to settle.

### a.    Debtor's Ability to Negotiate

First, the ACC objects to the Settlement Agreement, because it believes the Debtor lacked both knowledge and the necessary funds to resolve the coverage issue with New England. (ACC Am. Obj., p. 6.) These two issues "impaired" the CEO of the Debtor Mr. Stein's ability to negotiate with New England. (*Id.*) Prior to the bankruptcy

filing, New England, along with other insurance companies, provided the Debtor $2 million to fund the bankruptcy. (*Id.*) The ACC alleges New England was able to manipulate the Debtor's position because of its "compromised financial condition." Also, during the pendency of the bankruptcy and after negotiations of the Settlement Agreement, the Binder for the 1983 Policy appeared. The ACC believes that the Binder warrants an additional $10 million to the 1983 Policy. Because of this, the Settlement Agreement is said to be undervalued and the Debtor should withdraw from the Settlement Agreement to resume negotiations.

To bolster its contention about the Binder, the ACC draws a parallel between this case and *In re Budd Co., Inc.*, Bankr. No. 14-11873 (Bankr. N.D. Ill. 2014) (Schmetterer, J.). In *Budd*, the debtor entered into a pre-petition settlement. During the bankruptcy proceeding, documents were discovered and new information developed, which showed that the settlement was significantly undervalued. (*Budd* Dkt. No. 1134, pp. 14-18.) As a result, the debtor voluntarily withdrew from the settlement to renegotiate with the opposing party. (*Id.*) The ACC argues the Debtor should do the same.

Because of the Debtor's financial condition and prior ignorance of the Binder, the ACC contends the Debtor did not exercise a sound business decision by entering into the Settlement Agreement. (ACC Am. Obj., p. 9.) Therefore, it is argued that the Settlement Agreement should be rejected.

There is some support for the ACC argument in the fact that the parties have continued negotiations with some increase in the offer even while the Motion was pending. However, that increase only supports the reasonableness of settlement.

The financial position of the Debtor at the time of negotiations and prior ignorance of the Binder should not compel the Debtor to withdraw from the Settlement Agreement. The ACC relies on the fact that the Debtor received $2 million from the insurance companies in order to help it file for bankruptcy, but this fact does not suggest that the Debtor's judgment was compromised. The Debtor maintains that there

was "nothing inappropriate" about its motivations and negotiated in the best interest of the estate. (Dr's Resp., p. 3.) There is nothing to show that the Debtor was manipulated or in a compromised condition when negotiating the Settlement Agreement.

The discovery of the Binder does not affect the Settlement Agreement. Although the Binder presented new information regarding the 1983 Policy, it appears to lack any significant effect on the 1983 Policy. Described above, Illinois caselaw holds that a binder for an insurance policy is temporary, *Brown*, 734 N.E.2d at 969, and it is at best unclear under Illinois whether a binder is superseded by a renewal of the insurance policy, *but see Peele*, 840 A.2d at 1011; *Springer*, 731 N.E.2d at 1108. It was plausible for the Debtor to believe the Renewal Certificate would be found to supersede the Binder and it was not worth withdrawing from the Settlement Agreement. However, it appears from the increased settlement offer that Debtor continued negotiations with some success. This case is distinguished in *Budd*, in that the debtor in *Budd* received not only new information regarding the settlement but that the new information materially affected its reasoning for entering into the settlement agreement. (*Budd* Dkt. No. 447, pp. 1-2; Dkt. No. 1134, pp. 14-18.)

Circumstances here continue to support Debtor's justification for settling.

### b.    The Settlement Agreement Amount

The ACC's next major objection is the amount of the Settlement Agreement. The ACC argues that the Settlement Agreement is too low, because the Debtor has a strong likelihood of success in litigation, and therefore Settlement Agreement should be rejected. According to the ACC, the Settlement Agreement should be much larger because of two documents in relation to the 1983 Policy: the Binder and Renewal Certificate. (ACC Am. Obj., p. 7.) Together, these documents are said to warrant an additional $20 million of coverage in the 1983 Policy. The ACC's arguments in this regard, however, do not receive strong support from current Illinois precedent.

The ACC argues that the Renewal Certificate warrants an additional $10 million to the 1983 Policy in two ways.[1] It first argues that the renewal period of the Renewal Certificate affords another $10 million for the 1983 Policy. The 1983 Policy has a coverage period form March 1, 1983 to March 1, 1984. (ACC Am. Obj., Ex. A, at p. 1.) The Renewal Certificate provides, "[T]he Company's liability, as stated as the annual aggregate limit in Item 3-11 of the Declarations, shall apply as an Additional Limit during the Policy Period 3/1/84 to 3/1/85 for those coverages that are subject to an annual aggregate Limit of Liability. All other terms and conditions remain unchanged." (*Id.*, at Ex. C.) Because there are two policy periods, ACC argues there is an additional limits of $10 million. A new set of limits are said to occur because of the new period, for four reasons argued by the ACC:

- First, the Coverage section insures "all sums which the Insured shall be obligated to pay ... because of ... Personal Injury ... caused by an Occurrence." Insuring Agreements, I Coverage.
- Second, the Limits Of Liability section states that "the total limit of the Company's liability ... from any one Occurrence shall not exceed the amount specified in Item 3 I of the declarations." Insuring Agreements, III Limits Of Liability.
- Third, Item 3 I of the Declarations states that "[t]he limit of the Company's liability shall be ... $10,000,000 Single limit any one Occurrence." Item 2 of the Declarations defines the Policy Period as March 1, 1983 to March 1, 1984. Accordingly, a "$10,000,000 Single limit any one Occurrence" applies to the Policy Period March 1, 1983 to March 1, 1984. In other words, the $10 million "Single limit any one Occurrence" in Item 3 I is tied to the "Policy Period" in Item 2. The "Single limit any one Occurrence" applies to the "Policy Period", whatever the policy period may be.
- Fourth, the Policy defines Occurrence with specific reference to the policy period. Occurrence means "an accident or event including continuous repeated exposure to conditions, which results, during the policy period, in Personal Injury." (Definitions, H Occurrence.) "Personal Injury" also is tied to the policy period: "Personal Injury ...

---

[1] The ACC in its initial objection made an argument not repeated in its amended Objection. (*See* Dkt. No. 268.) As a result, the omitted argument will not be addressed.

means ... bodily injury ... which occurs during the policy period."
Definitions, I Personal Injury.

(ACC Am. Obj., p. 10.)  As a result, the renewal period of the Renewal Certificate is
claimed to create an additional $10 million of coverage, bringing the possible recovery
to $20 million.

Although the Renewal Certificate references an "additional" limit of $10 million,
the more pressing issue is whether the Renewal Certificate adds to the "per occurrence"
limit available for coverage towards asbestos claims.  Although not definitive, Illinois
caselaw suggests that asbestos use for manufacturing and production of products
equates to only a single occurrence. *See, e.g., U.S. Gypsum,* 643 N.E.2d at 1258-59
(considering asbestos-use a single occurrence when calculating deductibles); *Cont'l Cas.
Co.,* No. 04 CH 01708; *John Crane Inc.,* 2006 WL 1010495, at *26; *see also Nicor, Inc.,* 860
N.E. at 294-95.  The 1983 Policy provides a $10 million per occurrence limit, which has
already been exhausted.  (Dr's Mtn, at ¶ 12.)  Therefore, the only way the 1983 Policy
could have an additional $10 million of coverage for the asbestos claims would be if the
Renewal Certificate added to the "per occurrence" limit of the 1983 Policy.  The
Renewal Certificate does not offer any language to suggest that was done.  Further, the
Renewal Certificate states that aside from providing the additional limit of $10 million,
"All other terms and conditions remain unchanged." (ACC Am. Obj., Ex. C.)
Accordingly, the "additional limit" argument lacks weight and does not increase the
likelihood of success in litigating the matter.

Next, the ACC contends that the increase of the renewal premium of the
Renewal Certificate creates an additional $10 million limit.  Because the Debtor's
premium increased from $12,250 to $17,650, the Renewal Certificate is said to have
created a new $10 million of coverage.  The ACC relies on *Berg v. New York Life Ins. Co.,*
831 F.3d 426, 429-30 (7th Cir. 2016), which requires courts to read the policy in light of
the insureds reasonable expectations of coverage.  The ACC also points to Endorsement

14

#4 of the 1983 Policy, which amends the premium payment to $47,250. (ACC Am. Obj., Ex. A.) These increases in payments therefore are said to establish $10 million more in coverage of the 1983 Policy for asbestos claims.

The ACC's argument, however, fails to consider other factors that might cause a premium increase, such as: "the Debtor's loss history, the addition of coverage under the policy for additional companies with their own risks and loss history, other factors in the marketplace, or simply that the policy included an additional agreement limit." (NE Reply, p. 10.); *see UNR Industries, Inc. v. Cont'l Ins. Co.*, 1988 WL 121574, *3 (N.D. Ill. Nov. 9, 1988) (explaining reasons why a premium could increase). Because of these varying reasons why a premium would increase, it would not be reasonable for the Debtor to assume that the Renewal Certificate increased the "per occurrence" limit coverage of the 1983 Policy. *Berg*, 831 F.3d at 429-30. The premium increase does not by itself increase the likelihood of success in litigation.

In addition, ACC argues that the Binder warrants $10 million more in coverage for the 1983 Policy to pay for asbestos claims. The Binder period went from March 1, 1984 to May 1, 1985, which extended two months past the Renewal Certificate period. (ACC Am. Obj., Ex. B, at p. 1.) The Binder, according to ACC, created a fresh set of $10 million limits based on the extended two months or the "stub period." Although the Binder stated that it "will be terminated and superseded upon delivery of formal policy(ies)/certificate(s) issued to replace it," the ACC argues that the Renewal Certificate makes no mention of the Binder. It is also unclear whether the Renewal Certificate equated to a "formal certificate." Because of ambiguity regarding the Renewal Certificate, ACC claims that the Binder tacks on an additional $10 million to the 1983 Policy.

Illinois caselaw holds that a binder for an insurance policy is temporary, *Brown*, 734 N.E.2d at 969, and it is at best unclear under Illinois whether a binder is superseded by renewal of the insurance policy, *but see Peele*, 840 A.2d at 1011; *Springer*, 731 N.E.2d at

1108. Further, the ACC points to no Illinois precedent showing that a binder creates a new "per occurrence" limit. The issue of whether the Renewal Certificate actually supersedes the Binder is a question of fact. It is possible that a court hearing the dispute could find that the Renewal Certificate did so. As a result, the Binder does not increase the likelihood of success in litigation.

The ACC's arguments do not establish that the Debtor failed to exercise a sound business decision when entering into the Settlement Agreement. Even if the arguments put forth by the ACC showed a greater chance of success in litigation than the Debtor believed, all other factors suggest that settling was the proper action. *See In re Teknek, LLC*, 402 B.R. 257, 261 (Bankr. N.D. Ill. 2009).

### B.    Settlement Agreement's Releases, Injunctions, and Indemnifications

The last issue to address is the objection from the ACC asserting that the Settlement Agreement imposes unreasonable burdens on nonparty asbestos claimants. The ACC specifically takes issue with the indemnification obligations, third-party injunctions, and releases that "provide [New England] with blanket immunity." (ACC Am Obj, p. 14.)

The ACC takes issue with several provisions of the Settlement Agreement:

- The mandatory disclosure of Asbestos Claimants' confidential claim information (§ 4.5; Exhibits 3 and 4, ¶ 9);
- The inclusion of a non-Debtor injunction in any Chapter 11 plan proposed by the Debtor that would provide New England with blanket immunity against Asbestos Claimants' prepetition claims (§ 3.9);
- The requirement that Asbestos Claimants execute releases providing New England with blanket immunity against prepetition claims (§ 3.8); and
- The requirement that Asbestos Claimants indemnify New England to the extent of any payment of their claims, from claims arising from the Medicare Secondary Payer Act and regulations thereunder (Exhibits 3 & 4, ¶ 7).

(*Id.*)

The ACC cites to *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640,657 (7th Cir. 2008),

claiming that proper releases, injunctions, and indemnifications must be narrowly

tailored and essential to reorganization. *See also, In re Ingersoll, Inc.*, 562 F.3d 856, 865

(7th Cir. 2009). Because the Debtor is liquidating its remaining assets, the plan

confirmation here will not reorganize the business, thereby making all releases

unessential. The ACC also cite to a series of other cases in which third-party releases

were stricken because the chapter 11 plan was a liquidating plan or the releases were

too broad. *In re GAC Storage El Monte, LLC*, 489 B.R. 747 (Bankr. N.D. Ill. 2013); *In re

Draiman*, 450 B.R. 777 (Bankr. N.D. Ill. 2011); *In re Berwick Black Cattle Co.*, 394 B.R. 448,

461 (Bankr. C.D. Ill. 2008).

However, none of the foregoing cited cases involved approving a settlement

agreement, but rather were in cases confirming a chapter 11 plan. At this point, the

releases created by approval of the Settlement Agreement are only between the Debtor

and New England. (*See* Dr's Mtn, Ex. B, at p. 2.) The Settlement Agreement itself does

not create third-party releases but rather makes the Debtor responsible for including

such releases in confirmation plan that would do so. The arguments here are thus more

appropriate for objection to the Debtor's forthcoming chapter 11 plan. ACC has filed

such Objection. (Dkt. No. 468.)

Finally, New England and the Debtor removed a provision in the proposed

Settlement Agreement Order, which would require "each holder of an Asbestos Claim .

. . [to] execute a release" in order to receive payment from the estate or the Debtor. (NE

Reply, Ex 1, at p. 6.) Therefore, the Settlement Agreement itself does not grant New

England a release by asbestos claimants or impose any obligations on the asbestos

claimants.

## CONCLUSION

The recent filing by the ACC (Dkt. No. 515) being reviewed, and the reasoning therein is considered responded to by the foregoing Opinion.

Accordingly, the ACC's objections are overruled, and the Settlement Agreement will be approved by separate order.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 4th day of August, 2017